**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 12-2100**

———————

JEFFERY S. GUITON,

        Plaintiff – Appellant,

   v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security
Administration,

        Defendant – Appellee.

———————

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro. James A. Beaty, Jr.,
Chief District Judge. (1:08-cv-00822-JAB-LPA)

———————

Argued: September 19, 2013      Decided: November 7, 2013

———————

Before AGEE, DAVIS, and DIAZ, Circuit Judges.

———————

Affirmed by unpublished opinion. Judge Diaz wrote the opinion,
in which Judge Agee joined. Judge Davis wrote a separate
opinion concurring in the judgment.

———————

**ARGUED:** B. Michel Phillips, MARTIN & JONES, Decatur, Georgia,
for Appellant. Jason W. Valencia, SOCIAL SECURITY
ADMINISTRATION, Boston, Massachusetts, for Appellee. **ON BRIEF:**
Charles L. Martin, Decatur, Georgia; J. Kevin Morton, Winston-
Salem, North Carolina, for Appellant. Gill P. Beck, Assistant
United States Attorney, Civil Division, OFFICE OF THE UNITED
STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Jeffery S. Guiton appeals the district court's order affirming the Commissioner of Social Security's termination of his disability insurance benefits. Guiton contends that the decision to terminate his benefits is not supported by substantial evidence, and that the Administrative Law Judge ("ALJ") erred in crediting testimony by a Vocational Expert ("VE") regarding the number of existing jobs in the economy that Guiton could perform. We agree with the district court that substantial evidence supports the Commissioner's termination of Guiton's benefits and find no error in the ALJ's reliance on the VE's testimony. Accordingly, we affirm.

I.

Guiton, a North Carolina resident, first applied for benefits on July 31, 2000, after a doctor diagnosed him with a malignant brain tumor. Finding that Guiton was disabled within the meaning of the Social Security Act, the Commissioner awarded benefits. In October 2003, following a continuing disability review, the Commissioner found that Guiton's condition was "no longer severe enough to be considered disabling," and terminated Guiton's benefits. Tr. 55.[1]

---

[1] "Tr." refers to the administrative record transcript.

Guiton appealed the termination of his benefits first to a state agency hearing officer, and then to an ALJ. The ALJ held a hearing and affirmed the Commissioner's determination. After the Appeals Council denied review, Guiton sought review of the ALJ's decision in the U.S. District Court for the Middle District of North Carolina. Pursuant to a consent order, the district court reversed the termination of Guiton's benefits and remanded to the Commissioner. The ALJ held a second hearing, and again found that Guiton was no longer disabled within the meaning of the Social Security Act.

The ALJ adhered to the eight-step analytical framework that governs administrative reevaluation of Social Security disability awards.[2] See 20 C.F.R. § 404.1594(f). As relevant here, the ALJ assessed whether Guiton had experienced medical improvement related to his ability to work; whether he continued to suffer from an impairment sufficiently severe to be considered disabling; and if not, whether he retained the residual functional capacity ("RFC") to perform work that exists in significant numbers in the national economy. See id.

---

[2] This eight-step analysis essentially incorporates the more familiar five-step analysis governing the initial determination of whether a claimant is disabled. See 20 C.F.R. § 404.1520(a)(4).

4

The ALJ found that Guiton had indeed experienced medical improvement related to his ability to work. Although Guiton had not worked during the period of disability, he had undergone surgery to remove his brain tumor and had not suffered a seizure since 2000. The ALJ found that Guiton continued to suffer from several medically determinable impairments (including a seizure disorder, lumbar disc disease, low intellect, and a memory disorder), but that these impairments were not severe enough to be considered disabling under the applicable federal regulations. Specifically, the ALJ rejected Guiton's claim that his condition qualified as mental retardation under Listing 12.05C, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C, because he failed to establish (a) an onset of impairment before age 22, as the listing requires, and (b) the requisite deficits in adaptive functioning.

With respect to the onset of Guiton's impairment, the ALJ concluded that Guiton's brain tumor and related surgeries (which occurred after age 22) had negatively affected his IQ. The ALJ credited the written submission of John Bevis, a licensed psychological associate,[3] who opined that Guiton's pre-tumor

---

[3] In North Carolina, a licensed psychological associate is "[a]n individual to whom a license has been issued pursuant to [the North Carolina Psychology Practice Act] . . . and whose license permits him or her to engage in the practice of psychology." N.C. Gen. Stat. § 90-270.2(7). Licensure requires
(Continued)

intellectual abilities had likely been in the "borderline" range, which, the ALJ noted, is "outside the range for mental retardation and [Listing] 12.05C." Tr. 19. The ALJ found that the record evidence was consistent with this evaluation, specifically relying on the absence of any notation in Guiton's school records that he was mentally retarded, and pointing out that the low marks Guiton received in school tended to coincide with extended absences and poor effort.

The ALJ also found that Guiton had failed to demonstrate the requisite deficits in adaptive functioning. Questioning Guiton's claim that he is illiterate, the ALJ noted that Guiton often received "satisfactory" and "commendable" marks in school for reading, and that one report card indicated he was able to read at "level 8." Tr. 20. Additionally, the ALJ found that Guiton "washed his own clothes and dishes, cooked, vacuumed, helped his father and mowed the lawn with a riding mower." Tr. 20. The ALJ noted that Guiton lived alone at the time of the hearing, and found that he was able to "perform[] routine daily activities without difficulty." Tr. 20.

Concluding that Guiton had not met the requirements of a disability listing, the ALJ proceeded to the final two steps of

---

either a master's degree or a specialist degree in psychology. Id. § 90-270.11(b).

the analysis. First, the ALJ found that Guiton retained the RFC to perform light work. The ALJ discounted the opinions of several treating physicians that Guiton's condition would prevent him from sustaining full-time employment. Instead, the ALJ credited the statements of nonexamining state agency medical consultants who opined that Guiton could perform light work. The ALJ explained that this conclusion was more consistent with the evaluations of other physicians who had examined Guiton, as well as with other evidence in the record.

Finally, the ALJ concluded that, given Guiton's age, education, work experience, and RFC, he was able to perform work that exists in significant numbers in the economy. The ALJ credited the testimony of a state VE[4] who testified that Guiton was able to perform the requirements of three occupations identified in the Dictionary of Occupational Titles ("DOT").[5] To

---

[4] VEs are "persons who have, through training and experience in vocational counseling or placement, an up-to-date knowledge of job requirements, occupational characteristics and working conditions, and a familiarity with the personal attributes and skills necessary to function in various jobs." Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980). VEs routinely "assist the ALJ in determining whether there is work available in the national economy which [a] particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

[5] The DOT is a reference published by the U.S. Department of Labor that lists and describes various jobs. Its use in the disability review process is authorized by regulation. See 20 C.F.R. § 404.1566(d).

7

conclude that each of these occupations exists in significant numbers in both the North Carolina and national economies, the VE relied on the Occupational Employment Quarterly ("OEQ"), a commercial publication that employs government data to provide statistics regarding the number of available jobs by census-coded occupational category.

Having proceeded through the eight-step analysis, the ALJ concluded that Guiton was no longer disabled within the meaning of the Social Security Act, and was therefore not entitled to benefits.

In response, Guiton filed this action in the district court, seeking review of the Commissioner's termination of his benefits. A magistrate judge found that the decision was supported by substantial evidence and recommended affirming the Commissioner's determination. The district court adopted the magistrate judge's opinion and granted judgment on the pleadings to the Commissioner. Guiton appeals.

## II.

This court is authorized to review the Social Security Commissioner's termination of benefits under 42 U.S.C. § 405(g). In doing so, we "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v.

<u>Astrue</u>, 667 F.3d 470, 472 (4th Cir. 2012) (alteration in original) (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005) (internal quotation marks omitted). When reviewing for substantial evidence, we will not reweigh conflicting evidence or make credibility determinations. <u>Hancock</u>, 667 F.3d at 472. Rather, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." <u>Id.</u> (alteration in original) (internal quotation marks omitted).

## III.

On appeal, Guiton challenges the Commissioner's termination of his benefits in three respects. Guiton argues: (1) that the ALJ erred in finding that he failed to satisfy the requirements of Listing 12.05C, because the ALJ wrongly concluded that the onset of his disability occurred after age 22 and improperly determined that he had not demonstrated deficits in adaptive functioning; (2) that, by substituting his evaluation of the evidence and the opinion of nonexamining state agency medical consultants for the opinions of treating physicians, the ALJ erred in finding that Guiton retained the RFC to perform light

work; and (3) that the ALJ erred in crediting the VE's job numbers because they were based on a flawed statistical methodology.

## A.

We have considered Guiton's first two arguments and, for the reasons stated by the magistrate judge and adopted by the district court, find them to be without merit. See Guiton v. Astrue, No. 1:08CV822, 2012 WL 1267856 (M.D.N.C. Apr. 16, 2012). As the magistrate judge explained, the ALJ thoroughly analyzed the testimony and available evidence, and reasonably concluded that Guiton (1) failed to meet the requirements of Listing 12.05C; and (2) retained the RFC to perform light work. In challenging these findings, Guiton essentially asks us to "reweigh conflicting evidence, make credibility determinations, [and] substitute our judgment for that of the [ALJ]." Hancock, 667 F.3d at 472 (alteration in original) (internal quotation marks omitted). This we are not authorized to do. We instead hold that the ALJ's findings with respect to these issues are supported by substantial evidence.

## B.

Guiton's third argument requires further discussion. At the last of the eight steps, the Commissioner bears the burden of demonstrating that work the claimant can perform exists in significant numbers in the national economy. See 20 C.F.R.

10

§ 404.1594(f); id. § 404.1560(c)(2).  Guiton submits that the ALJ erred in concluding that the Commissioner satisfied this burden, arguing that the ALJ impermissibly credited testimony by the VE regarding job statistics that were insufficiently specific.

During the administrative hearing, the VE testified that Guiton is able to perform at least three occupations.  She identified these occupations by DOT code: bench assembler (DOT 706.684-022); assembler arranger (DOT 739.687-010); and agricultural sorter (DOT 529.687-186).  The VE then reported the number of existing jobs in the North Carolina and national economies for each of these occupations, gleaning the numbers from the OEQ.  As Guiton points out, however, the OEQ reports job numbers by census code, not by DOT code.  Census codes are broader designations than DOT codes, and a single census code may comprise numerous DOT-coded occupations.[6]  Guiton therefore argues that the job numbers the VE reported from the OEQ overstate the actual number of jobs in the economy available to him, because they likely include many jobs associated with DOT-coded occupations he is unable to perform.  Guiton contends that without some reliable methodology for determining the number of

---

[6] For example, Guiton points out that the DOT code for bench assembler is one of 1,687 DOT codes included within a single census code.

11

jobs corresponding to the specific DOT-coded occupations the VE identified, it was error for the ALJ to credit the VE's testimony.

We have not previously addressed the issue of a VE's reliance on job numbers from the OEQ, and it appears that only one other circuit has done so directly.[7] In Liskowitz v. Astrue, 559 F.3d 736 (7th Cir. 2009), the Seventh Circuit considered a similar argument regarding the specificity of OEQ job numbers. Noting that OEQ job numbers include both full-time and part-time positions--and contending that only full-time positions suffice to carry the Commissioner's burden--the claimant in that case argued that the ALJ should not have credited the job numbers a

---

[7] In Brault v. Social Security Administration Commissioner, 683 F.3d 443 (2d Cir. 2012), the Second Circuit described, in a footnote, a similar argument to the one raised here, made by the claimant in that case before an ALJ. Id. at 443, 447 n.4 (per curiam). The claimant had disputed the reliability of job numbers that a VE derived from a newer version of the OEQ on the basis that it reported job numbers by standard occupational classification ("SOC") code rather than DOT code. SOC codes, like the census codes involved here, may each comprise numerous DOT codes. Id. The court acknowledged that this "many-to-one mapping" problem might cause a VE's job estimates to "deviate significantly from the actual number of existing positions." Id. On appeal, however, the claimant argued only that the ALJ had not provided him a sufficient opportunity to challenge the VE's testimony, and that the ALJ had not adequately explained its reasoning. Rejecting these arguments, the court left the merits of the ALJ's reliance on the VE's testimony "for another day and a closer case." Id. at 450.

VE reported because the VE had not further identified the percentage of the jobs that were full-time. Id. at 743-44.

The court rejected this challenge. Acknowledging that the OEQ is a "source on which VEs customarily rely," id. at 744, the court determined that requiring more specific numbers would lead to "significant practical problems," id. at 745. The court explained that because "no government data source contains" the full-time-only data that the claimant was requesting, insisting that a VE produce such data would "impose impossible burdens on the VE." Id. at 745. A VE, after all, is "not . . . a census taker or statistician." Id. at 743. The court thus found no error in the ALJ's reliance on the VE's testimony.

Similar considerations guide us here. As the ALJ explained, the DOT-specific job numbers Guiton would have the VE provide simply do not exist: "There apparently is no data, updated on a regular basis, available through either a public or private source[], that reports numbers of jobs by DOT code number." Tr. 34. Guiton does not dispute this observation. Thus, if we required a VE to produce job statistics specific to the DOT-coded occupations a claimant can perform, it is unlikely that the Commissioner would ever succeed in satisfying her burden. This cannot be the result the regulations intend. Indeed, that the data Guiton requests does not exist "is a sign that [Guiton] expects too much," and like the Seventh Circuit,

13

we decline to "impose impossible burdens on the VE." See Liskowitz, 559 F.3d at 745.

In this case, the VE cited the existence of 26,330 jobs in North Carolina and 825,000 jobs in the United States that Guiton could perform. Tr. 624. Even assuming these numbers were overinclusive, far smaller figures would still suffice to satisfy the Commissioner's burden. See Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (holding that 110 jobs in the claimant's state was a significant number). We hold that the job numbers the VE provided, although perhaps somewhat imprecise, were sufficiently reliable to support the ALJ's conclusion.

IV.

For the reasons stated above, we affirm the decision of the district court.

AFFIRMED

DAVIS, Circuit Judge, concurring in the judgment:

I write separately to express my discomfort with the ALJ's acceptance of the vocational expert's uncritical reliance on the Occupational Employment Quarterly ("OEQ") to calculate the number of jobs available in the economy. Under the legal regime applicable in this case, once a claimant such as Guiton establishes that he has some limitations and cannot perform his past work, "the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform considering h[is] age, education, and work experience." Hancock v. Astrue, 667 F.3d 470, 472-73 (4th Cir. 2012) (internal quotation marks omitted). "This is generally done through testimony of a vocational expert." Harvey v. Heckler, 814 F.2d 162, 164 (4th Cir. 1987). Jobs exist in the national economy if they are available in "significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). See also 20 C.F.R. § 404.1566.

In this case, the ALJ accepted the vocational expert's testimony that Guiton could perform three widely available jobs listed in the Dictionary of Occupational Titles ("DOT"): bench assembler, assembler arranger, and agricultural sorter. The expert said that she obtained the numbers from the privately published OEQ, which breaks down the number of available jobs by

15

Census Code and exertion subcategory (e.g., "unskilled, light"), but not by DOT title. She could not say how the publisher calculates its numbers. Guiton's counsel argued that this rendered her testimony unreliable, but the ALJ disagreed. He reasoned that no "public or private sources . . . report[] numbers of jobs by DOT code number," so the expert "had to rely on the numbers given in the OEQ." The ALJ further reasoned that the expert's testimony was reliable because "this is an area where mathematical precision is virtually impossible to achieve."

Guiton maintains on appeal that the vocational expert's testimony was unreliable because "her conclusions [were] not found in any publication, and [she] could not explain her methodology in deriving her conclusions from published data." Opening Br. 34. Guiton argues that "OEQ provides job numbers only for exertional and skill levels by census code, but not by DOT code." Id. at 37 (emphasis in original). This is significant, he argues, because "[t]he census code that includes bench assembler . . . includes 1,687 separate DOT occupations-- not 1,687 jobs, but 1,687 occupations." Id. at 36 (emphasis in original) (italics omitted). Guiton argues that the OEQ "simply is not specific enough," id. at 37 (emphasis omitted), and "[w]ithout testimony showing a reasonable, repeatable, verifiable methodology, the DOT job numbers provided by the

16

vocational expert are not reliable," id. at 39 (emphasis omitted).

The Commissioner concedes that "it is impossible to use binding precedent to adequately defend against Guiton's allegations," as this Court "has not addressed a challenge to a [vocational expert's] reliance on the OEQ." Resp. Br. 32 (emphasis omitted). Nonetheless, the Commissioner argues that vocational experts "typically rely on the OEQ," the information used in forming an expert opinion need not be admissible, and a vocational expert need not be able to explain the methodology behind the OEQ. Id. at 33–34 (emphasis omitted). Surely, the Commissioner can do better than this.

Only two circuits--the Second and the Seventh Circuits-- have discussed the OEQ. In Brault v. Social Security Administration Commissioner, the Second Circuit recognized the OEQ's "classic academic problem with data aggregation," i.e., the "information loss" that results from "many-to-one mapping." 683 F.3d 443, 447 n.4 (per curiam).[1]

---

[1] Brault involved a newer version of the OEQ, the Occupational Employment Quarterly II, which uses standard occupational classification ("SOC") codes. 683 F.3d at 446. Like the Census Code, standard occupational classification is a "system . . . used by Federal statistical agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data." Bureau of Labor Statistics, "Standard Occupational Classification," available at http://www.bls.gov/soc/ (last visited Aug. 19, 2013). "DOT codes (Continued)

> If, for example, ten DOT codes map to a single SOC[2] code, saying there are 100,000 total positions available in that SOC code gives no information at all about how many positions each of the ten DOT codes contributed to that total. This becomes a problem if DOT titles with different exertion or skill levels map to the same SOC code. In such a situation, the OEQ apparently uses a rough weighted average algorithm--if ten DOT codes correspond to one SOC code, and four of those codes are light-duty, unskilled positions, then the OEQ will list 40% of the positions available in that SOC as light-duty, unskilled positions. <u>That estimate may deviate significantly from the actual number of existing positions</u>.

<u>Id.</u> (emphasis added). Nonetheless, the Second Circuit affirmed the ALJ's denial of benefits despite the vocational expert's reliance on the OEQ;[3] rather than challenge the reliability of the publication, the appellant argued that the ALJ had been required to (1) give the appellant "an opportunity to inspect and challenge the proffered evidence," and (2) "explain why the challenge was rejected." <u>Id.</u> at 448.[4]

---

are much more granular than SOC codes--according to Brault, there were nearly 13,000 jobs titles in the 1991 edition of the DOT, but only about 1,000 SOC titles." <u>Brault</u>, 683 F.3d at 446.

[2] <u>See</u> <u>supra</u> note 1.

[3] The vocational expert in <u>Brault</u> "denied having reported the numbers for the entire SOC. Instead, he claimed to have 'reduced' the numbers from 'the entire [SOC] code' to only count 'jobs . . . . that [he] kn[e]w exist[ed].'" <u>Brault</u>, 683 F.3d at 447.

[4] The Second Circuit held that ALJs had no duty to explain. <u>Brault</u>, 683 F.3d at 449. Assuming without deciding that ALJs must give claimants a chance to inspect and challenge evidence, (Continued)

18

In Liskowitz v. Astrue, the Seventh Circuit observed that the OEQ "seem[s] to be a source on which [vocational experts] customarily rely." 559 F.3d 736, 744 (7th Cir. 2009). But the court found that the appellant had waived the argument that her vocational expert "should not have relied on the OEQ because it was published by a private company." Id. In assessing the more general (and preserved) challenge that the vocational expert had not been able "to testify as to the reliability of the data she used,"[5] the court observed that

> [t]he witness was testifying as a vocational expert, not as a census taker or statistician. Indeed, even if the [vocational expert] had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions. After all, statisticians use arithmetic operations, but few probably have studied the foundation of arithmetic in set theory. Is the statistician's use of arithmetic therefore unjustified? Clearly not.

Id. at 743.[6]

_____

the court found that the ALJ had done so. Id. at 450.

[5] In addition to the OEQ, the vocational expert used sources published by the U.S. Department of Labor and the Wisconsin Department of Workforce Development. Liskowitz, 559 F.3d at 743–44.

[6] Two other Seventh Circuit opinions make only fleeting references to the OEQ. See Britton v. Astrue, 521 F.3d 799, 804 (7th Cir. 2008) (per curiam) (rejecting appellant's claim that she should have been given access to the entire OEQ, not just the portion on which the vocational expert had relied, because the "selections . . . would have allowed [appellant's counsel] (Continued)

Guiton's argument raises real concerns. Although vocational experts customarily rely on the OEQ, Liskowitz, 559 F.3d at 744, the Second Circuit has aptly noted that the publication's utility in social security proceedings is problematic, see Brault, 683 F.3d at 447 n.4. The difference between Census Code data and DOT titles is vast: as Guiton points out, "[t]he census code that includes bench assembler . . . includes 1,687 separate DOT occupations." Opening Br. 36. Moreover, unlike the expert in Brault, the vocational expert here apparently did not adjust the OEQ's numbers to reflect what she knew existed in a particular market; rather, she apparently accepted OEQ's numbers as accurate without further inquiry.

I am willing to accept, for this case only, the majority's reasoning that "[e]ven assuming [the vocational expert's estimates] were overinclusive, far smaller figures would still suffice to satisfy the Commissioner's burden." Ante, at 13. I do not believe, however, that an attitude reflecting a belief that the performance of vocational experts in social security cases "is good enough for government work" should be the test of

_____

to sufficiently test the reliability of [the expert's] testimony"); Lawrence v. Astrue, 337 F. App'x 579, 583, 586 (7th Cir. 2009) (noting that the appellant did not challenge the conclusion of the vocational expert, who had relied in part on the OEQ).

reliability.[7] After all, it is Congress and the Commissioner that are responsible for seeing to the creation and implementation of reliable evidentiary standards. Federal courts should not too willingly indulge a watered down application of well-settled evidentiary reliability criteria for a discrete class of disfavored cases.

With these observations, I concur in the judgment.

---

[7] And some commentators have recognized the fundamental problems this attitude may pose for the structure of the social security regime. See Jon C. Dubin, Overcoming Gridlock: Campbell After A Quarter-Century and Bureaucratically Rational Gap-Filling in Mass Justice Adjudication in the Social Security Administration's Disability Programs, 62 Admin. L. Rev. 937, 966 (2010) ("[T]here are no prescribed standards for job incidence or non-DOT job characteristics evidence and this evidence is often produced through questionable job data and unreliable methodologies."); Nathaniel O. Hubley, The Untouchables: Why A Vocational Expert's Testimony in Social Security Disability Hearings Cannot Be Touched, 43 Val. U. L. Rev. 353, 393 (2008) ("With the seemingly high degree of deference given to the ALJ with regard to evidentiary matters and the relatively broad credibility granted to the VE's testimony, the question bound to arise is whether an adequate level of fairness is afforded disability claimants.").