DAVIS, Circuit Judge,
concurring in the judgment:
I write separately to express my discomfort with the ALJ’s acceptance of the vocational expert’s uncritical reliance on the Occupational Employment Quarterly (“OEQ”) to calculate the number of jobs available in the economy. Under the legal regime applicable in this case, once a claimant such as Guitón establishes that he has some limitations and cannot perform his past work, “the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform considering h[is] age, education, and work experience.” Hancock v. Astrue, 667 F.3d 470, 472-73 (4th Cir.2012) (internal quotation marks omitted). “This is generally done through testimony of a vocational expert.” Harvey v. Heckler, 814 F.2d 162, 164 (4th Cir.1987). Jobs exist in the national economy if they are available in “significant numbers either in the region where such individual lives or in several regions of the country.” 42 U.S.C. § 423(d)(2)(A). See also 20 C.F.R. § 404.1566.
In this case, the ALJ accepted the vocational expert’s testimony that Guitón could perform three widely available jobs listed in the Dictionary of Occupational Titles (“DOT”): bench assembler, assembler arranger, and agricultural sorter. The expert said that she obtained the numbers from the privately published OEQ, which breaks down the number of available jobs by Census Code and exertion subcategory (e.g., “unskilled, light”), but not by DOT title. She could not say how the publisher calculates its numbers. Guiton’s counsel argued that this rendered her testimony unreliable, but the ALJ disagreed. He reasoned that no “public or private sources ... report[ ] numbers of jobs by DOT code number,” so the expert “had to rely on the numbers given in the OEQ.” The ALJ further reasoned that the expert’s testimony was reliable because “this is an area where mathematical precision is virtually impossible to achieve.”
Guitón maintains on appeal that the vocational expert’s testimony was unreliable because “her conclusions [were] not found in any publication, and [she] could not explain her methodology in deriving her conclusions from published data.” Opening Br. 34. Guitón argues that “OEQ provides job numbers only for exertional and skill levels by census code, but not by DOT code.” Id. at 37 (emphasis in original). This is significant, he argues, because “[t]he census code that includes bench assembler ... includes 1,687 separate DOT occupations — not 1,687 jobs, but 1,687 occupations.” Id. at 36 (emphasis in original) (italics omitted). Guitón argues that the OEQ “simply is not specific enough,” id. at 37 (emphasis omitted), and “[without testimony showing a reasonable, repeatable, verifiable methodology, the DOT job numbers provided by the vocational expert are not rehable,” id. at 39 (emphasis omitted).
The Commissioner concedes that “it is impossible to use binding precedent to adequately defend against Guiton’s allegations,” as this Court “has not addressed a challenge to a [vocational expert’s] reliance on the OEQ.” Resp. Br. 32 (emphasis omitted). Nonetheless, the Commissioner argues that vocational experts “typically rely on the OEQ,” the information used in forming an expert opinion need not be admissible, and a vocational expert need *144 not be able to explain the methodology behind the OEQ. Id. at 33-34 (emphasis omitted). Surely, the Commissioner can do better than this.
Only two circuits — the Second and the Seventh Circuits — have discussed the OEQ. In Brault v. Social Security Administration Commissioner, the Second Circuit recognized the OEQ’s “classic academic problem with data aggregation,” i.e., the “information loss” that results from “many-to-one mapping.” 683 F.3d 443, 447 n. 4 (per curiam).[1]
If, for example, ten DOT codes map to a single SOC[2] code, saying there are 100,000 total positions available in that SOC code gives no information at all about how many positions each of the ten DOT codes contributed to that total. This becomes a problem if DOT titles with different exertion or skill levels map to the same SOC code. In such a situation, the OEQ apparently uses a rough weighted average algorithm — if ten DOT codes correspond to one SOC code, and four of those codes are light-duty, unskilled positions, then the OEQ will list 40% of the positions available in that SOC as light-duty, unskilled positions. That estimate may deviate significantly from the actual number of existing positions.
Id. (emphasis added). Nonetheless, the Second Circuit affirmed the ALJ’s denial of benefits despite the vocational expert’s reliance on the OEQ;[3] rather than challenge the reliability of the publication, the appellant argued that the ALJ had been required to (1) give the appellant “an opportunity to inspect and challenge the proffered evidence,” and (2) “explain why the challenge was rejected.” Id. at 448.[4]
In Liskowitz v. Astrue, the Seventh Circuit observed that the OEQ “seem[s] to be a source on which [vocational experts] customarily rely.” 559 F.3d 736, 744 (7th Cir.2009). But the court found that the appellant had waived the argument that her vocational expert “should not have relied on the OEQ because it was published by a private company.” Id. In assessing the more general (and preserved) challenge that the vocational expert had not been able “to testify as to the reliability of the data she used,”[5] the court observed that
[t]he witness was testifying as a vocational expert, not as a census taker or statistician. Indeed, even if the [voca *145 tional expert] had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions. After all, statisticians use arithmetic operations, but few probably have studied the foundation of arithmetic in set theory. Is the statistician’s use of arithmetic therefore unjustified? Clearly not.
Id. at 743.[6]
Guiton’s argument raises real concerns. Although vocational experts customarily rely on the OEQ, Liskowitz, 559 F.3d at 744, the Second Circuit has aptly noted that the publication’s utility in social security proceedings is problematic, see Brault, 683 F.3d at 447 n. 4. The difference between Census Code data and DOT titles is vast: as Guitón points out, “[t]he census code that includes bench assembler ... includes 1,687 separate DOT occupations.” Opening Br. 36. Moreover, unlike the expert in Brault, the vocational expert here apparently did not adjust the OEQ’s numbers to reflect what she knew existed in a particular market; rather, she apparently accepted OEQ’s numbers as accurate without further inquiry.
I am willing to accept, for this case only, the majority’s reasoning that “[e]ven assuming [the vocational expert’s estimates] were overinclusive, far smaller figures would still suffice to satisfy the Commissioner’s burden.” Ante, at 142. I do not believe, however, that an attitude reflecting a belief that the performance of vocational experts in social security cases “is good enough for government work” should be the test of reliability.[7] After all, it is Congress and the Commissioner that are responsible for seeing to the creation and implementation of reliable evidentiary standards. Federal courts should not too willingly indulge a watered down application of well-settled evidentiary reliability criteria for a discrete class of disfavored cases.
With these observations, I concur in the judgment.

. Brault involved a newer version of the OEQ, the Occupational Employment Quarterly II, which uses standard occupational classification ("SOC”) codes. 683 F.3d at 446. Like the Census Code, standard occupational classification is a "system ... used by Federal statistical agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data.” Bureau of Labor Statistics, "Standard Occupational Classification,” available at http://www.bls.gov/soc/ (last visited Aug. 19, 2013). "DOT codes are much more granular than SOC codes — according to Brault, there were nearly 13,000 jobs titles in the 1991 edition of the DOT, but only about 1,000 SOC titles.” Brault, 683 F.3d at 446.

2. See supra note 1.

. The vocational expert in Brault "denied having reported the numbers for the entire SOC. Instead, he claimed to have 'reduced' the numbers from ‘the entire [SOC] code’ to only count jobs.... that [he] kn[e]w existed].' ” Brault, 683 F.3d at 447.

. The Second Circuit held that ALJs had no duty to explain. Brault, 683 F.3d at 449. Assuming without deciding that ALJs must give claimants a chance to inspect and challenge evidence, the court found that the ALJ had done so. Id. at 450.

. In addition to the OEQ, the vocational expert used sources published by the U.S. Department of Labor and the Wisconsin Department of Workforce Development. Liskowitz, 559 F.3d at 743-44.

. Two other Seventh Circuit opinions make only fleeting references to the OEQ. See Britton v. Astrue, 521 F.3d 799, 804 (7th Cir.2008) (per curiam) (rejecting appellant's claim that she should have been given access to the entire OEQ, not just the portion on which the vocational expert had relied, because the "selections ... would have allowed [appellant’s counsel] to sufficiently test the reliability of [the expert’s] testimony”); Lawrence v. Astrue, 337 Fed.Appx. 579, 583, 586 (7th Cir.2009) (noting that the appellant did not challenge the conclusion of the vocational expert, who had relied in part on the OEQ).

. And some commentators have recognized the fundamental problems this attitude may pose for the structure of the social security regime. See Jon C. Dubin, Overcoming Gridlock: Campbell After A Quarter-Century and Bureaucratically Rational Gap-Filling in Mass Justice Adjudication in the Social Security Administration's Disability Programs, 62 Admin. L.Rev. 937, 966 (2010) ("[T]here are no prescribed standards for job incidence or non-DOT job characteristics evidence and this evidence is often produced through questionable job data and unreliable methodologies.”); Nathaniel O. Hubley, The Untouchables: Why A Vocational Expert’s Testimony in Social Security Disability Hearings Cannot Be Touched, 43 Val. U.L.Rev. 353, 393 (2008) ("With the seemingly high degree of deference given to the AU with regard to evidentiary matters and the relatively broad credibility granted to the VE’s testimony, the question bound to arise is whether an adequate level of fairness is afforded disability claimants.”).