In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1066

BETTY L. BROWN,

*Plaintiff-Appellant*,

*v.*

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 14 CV 894 — **Barbara B. Crabb**, *Judge.*

ARGUED SEPTEMBER 21, 2016 — DECIDED DECEMBER 22, 2016

Before FLAUM, KANNE, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge.* Betty Brown applied for disability benefits on the ground that her bad back and obesity left her in too much pain to work. The Social Security Administration denied Brown's application, and after holding a hearing, an administrative law judge (ALJ) upheld the deni-

al, concluding that Brown could perform sedentary work associated with six jobs identified by a vocational expert.

Brown challenges this denial of benefits on several grounds. First, she argues that the ALJ insufficiently considered her obesity. We disagree. The ALJ repeatedly stated that he had considered Brown's obesity, discussed multiple treatment records that identified the obesity, and rejected the opinions of several government-related experts that insufficiently accounted for the obesity. Brown also contends that the ALJ improperly relied on the vocational expert's testimony from the administrative hearing, claiming that the expert failed to provide enough information to justify her departure from the Dictionary of Occupational Titles—which provides occupational information about myriad jobs in the U.S. economy—and failed to verify the source of the data on which her jobs-related opinions were based. But Brown forfeited most of these arguments by failing to object to the expert's testimony during the hearing, and the one error that the ALJ did commit was harmless.

However, we agree with Brown that the ALJ violated the Treating Physician Rule when he rejected certain opinions proffered by Brown's doctor regarding Brown's ability to sit and stand for prolonged periods of time. In substituting his own opinions for the doctor's, the ALJ focused on facts that did not directly pertain to sitting or standing and misrepresented multiple statements Brown made to treatment providers and others. So we vacate the ALJ's denial of benefits and remand the case for further proceedings.

## I. BACKGROUND

Betty Brown is five feet five inches tall and her weight has exceeded 300 pounds for over ten years. Medical records dating back to February 2004 indicate that Brown has long suffered from chronic back pain, due at least in part to several mild spinal fractures that she suffered during a car accident in 2003. Brown's back pain became more significant as the result of a second car accident in July 2004, as well as incidents in June 2006 and January 2007 during which she heard popping noises in her back. Throughout this period, Brown regularly visited her treating physician, Dr. William Shannon, who prescribed her several medications—most notably (and most often) oxycodone, with the daily dosage steadily increasing from 30 mg in May 2004 to 240 mg in September 2009.

In March 2007, Brown applied for disability insurance benefits and supplemental security income under 42 U.S.C. §§ 416(i) and 423. At the time, she weighed approximately 310 pounds, was not working (she claimed to have last worked in October 2004), and complained that her back pain prevented her from sitting or standing for more than 30 minutes at a time and required that she periodically lie down. The Social Security Administration denied both benefits applications, and an ALJ, after holding a hearing, followed suit.

For reasons that we need not discuss, the ALJ was required to consider Brown's benefits applications two additional times, most recently in August 2014. In that latter decision, the ALJ again denied Brown's applications, and in doing so followed the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520(a)(4). The ALJ first conclud-

ed Brown had not performed substantial gainful activity since January 2007, and, second, found that Brown had three "severe" impairments—back pain, obesity, and migraines. Third, the ALJ determined that none of these impairments individually or collectively met the listed impairments in Appendix 1 to 20 C.F.R. § 404, Subpart P, and that Brown had the residual functional capacity to perform sedentary work with a sit/stand option so that she could avoid sitting or standing for more than thirty minutes at a time. Fourth, the ALJ found that Brown could not do her past work as a cook based on this residual functional capacity. Finally, the ALJ, relying on testimony from a vocational expert, found that Brown could perform six other jobs that existed in significant numbers in the economy—assembler, order clerk, office helper, video surveillance monitor, greeter/attendant, and telephone solicitor.

Based on these findings, the ALJ determined that Brown was not disabled. The district judge affirmed the ALJ's determination, and this appeal followed.

## II. ANALYSIS

On appeal, Brown raises the same three arguments that the district judge considered and rejected—that the ALJ improperly evaluated her obesity, that the ALJ improperly applied the Treating Physician Rule, and that there was inadequate support for the vocational expert's testimony about jobs available to Brown in light of her physical limitations. Because we review the district judge's decision de novo, we review the ALJ's decision directly and ask whether there is "substantial evidence" that "a reasonable mind might accept as adequate to support" the conclusions at issue. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citation omitted). In

doing so, we may not decide facts anew or make independent credibility determinations, and must affirm the ALJ's decision even if reasonable minds could differ about the ultimate disability finding. *Id.* (citations omitted). "We limit our review to the reasons articulated by the ALJ in the written decision." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).

### A. ALJ Adequately Considered Brown's Obesity

Although obesity has been removed as a standalone listing from Appendix 1's list of disabling impairments, it must still be considered when evaluating the severity of other impairments in the five-step sequential analysis. *Castile v. Astrue*, 617 F.3d 923, 928 (7th Cir. 2010) (discussing SSR 02-1p, 67 Fed. Reg. 57859-02 (Sept. 12, 2002)). Obesity cannot be ignored because "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." SSR 02-1p; *see also Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40."). While an ALJ need not painstakingly evaluate every piece of evidence when undertaking this analysis, the ALJ "must build a logical bridge from evidence to conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (per curiam).

Brown maintains that although the ALJ acknowledged her obesity, he "fail[ed] to make the bridge between that condition and the numerous physical problems noted in the record." According to Brown, the ALJ linked her back injuries with her complaints of pain and use of prescription medication, but failed to acknowledge that the severity of her pain and the corresponding need for large amounts of medication could only have resulted from injury *and obesity*.

Although the issue is close, we find that the ALJ adequately considered Brown's obesity alongside her severe back pain. As Brown herself concedes, the ALJ repeatedly asserted that he had considered her obesity. For example, he stated that he "considered the fact that obesity may increase the severity of [Brown]'s back pain symptoms and may increase her fatigue and ability to sustain work activity on a regular and continuing basis"; that Brown's "back disorder, obesity, and migraine headaches, considered in combination, warrant the restrictions set forth in the residual functional capacity"; and that he "fully considered the impact of [Brown]'s morbid obesity on her musculoskeletal impairment." Brown claims that these statements are merely conclusory, but we disagree. On multiple occasions, the ALJ referenced portions of Dr. Shannon's treatment notes that discussed Brown's weight, his encouragement that she lose weight, the increasing pain she endured as a result of her weight-loss attempts, and her inability to walk more than two blocks at a time or lift more than five pounds. More notable is the ALJ's rejection of the opinions of several government-affiliated doctors on the ground that the "longitudinal record demonstrates that [Brown]'s back impairment *together with her morbid obesity* would prevent her from working above the sedentary exertional level on a regular and continuing basis." (emphasis added).

To be sure, the ALJ could have more explicitly detailed the effect that he believed Brown's obesity, in conjunction with her back pain, had on her ability to sit, stand, walk, and otherwise move. *Cf. Castile*, 617 F.3d at 928–29 (concluding that ALJ adequately considered obesity by discussing, among other things, the claimant's functioning with her obesity prior to her onset date, and the absence of advice from

any treating physician that she restrict work-related activi-
ties, observe certain precautions, or not work at all). Howev-
er, after reviewing the ALJ's eighteen-page, single-spaced
opinion, we cannot say that he failed to "articulate at some
minimal level his analysis of the evidence," *Herron v. Shalala*,
19 F.3d 329, 333 (7th Cir. 1994) (citation and internal quota-
tion mark omitted), or that we simply "don't know what he
thought," *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir.
2004). So Brown has failed to demonstrate that the ALJ's
consideration of her obesity was unacceptable.

### B. Treating Physician Rule Improperly Applied

Under the Treating Physician Rule, a treating physician's
opinion "regarding the nature and severity of a medical
condition is entitled to controlling weight if it is well sup-
ported by medical findings and not inconsistent with other
substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d
863, 870 (7th Cir. 2000). When controlling weight is not giv-
en, an ALJ must offer "good reasons" for doing so, after hav-
ing considered: (1) whether the physician examined the
claimant, (2) whether the physician treated the claimant, and
if so, the duration of overall treatment and the thoroughness
and frequency of examinations, (3) whether other medical
evidence supports the physician's opinion, (4) whether the
physician's opinion is consistent with the record, and (5)
whether the opinion relates to the physician's specialty. *Lar-
son v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing 20
C.F.R. § 404.1527(d)(2)); 20 C.F.R. § 404.1527(c).

Here, Dr. Shannon opined that Brown (i) could sit for no
more than thirty minutes at a time and no more than two
hours during a workday; (ii) could stand for no more than
fifteen minutes at a time and no more than two hours during

a workday; (iii) would need frequent periods of walking and lying down throughout the workday; (iv) could occasionally lift up to ten pounds at a time; and (v) would likely be absent from work more than three times per month. The ALJ decided not to give controlling weight to Dr. Shannon's opinions regarding sitting, walking/lying down, and work absences, reasoning that they were not supported by his treatment notes and were belied by Brown's own reports of her daily living activities. Instead, the ALJ determined that Brown could perform a full day of sedentary work alternating between sitting and standing (though doing neither for more than thirty minutes at a time).

That decision was erroneous. For one, Dr. Shannon's treatment records support his opinions. In over a dozen individualized assessments spread across five years, Dr. Shannon repeatedly referenced the chronic and severe back pain that radiated to Brown's upper back and hips; that this pain was exacerbated by cold, damp weather and by physical activity such as exercise and sitting or standing for prolonged periods; that this pain often prevented her from sleeping for more than two hours at a time; and that Brown required ever-increasing dosages of oxycodone (from 30 mg initially to 240 mg) in order to manage her pain. Taken together, these observations contradict the ALJ's conclusion that Dr. Shannon's "findings over time are quite benign and offer little support for the degree of limitation that he assessed."

In addition, the Commissioner supplies little insight into what additional observations or tests Dr. Shannon could have conducted to support his challenged opinions. Nor does the Commissioner's brief discuss any cases that shed light on this issue. Perhaps the Commissioner would be sat-

isfied only if Dr. Shannon had somehow replicated a full work day to test the limits of Brown's sitting and standing endurance. Such an approach, however, would be both cruel for patients and unrealistic for doctors, given the average medical practitioner's time and resource constraints.

And even assuming that some of Dr. Shannon's opinions were not fully corroborated by his treatment records, the ALJ cited no evidence that *contradicted* the opinions. This distinction is an important one, since the mere absence of detailed treatment notes, without more, is "insufficient grounds for disbelieving the evidence of a qualified professional." *Herrmann v. Colvin*, 772 F.3d 1110, 1111 (7th Cir. 2014); *accord Clifford*, 227 F.3d at 870. The ALJ emphasized the fact that Dr. Shannon frequently observed that Brown had a stable gait, performed leg raises without incident, and had normal reflexes and mild to moderate range-of-motion limitations. But these observations do nothing to undermine the sitting, resting, and work-absence opinions that the ALJ rejected. Brown's gait was observed as she walked, the leg raises were likely performed while she was lying down, and it is unclear how (if at all) the reflexes and range-of-motion tests were relevant to Brown's ability to sit or stand for extended periods. In effect, the ALJ substituted his judgment for Dr. Shannon's without explaining *why* Brown's activities were inconsistent with Dr. Shannon's opinions.

The ALJ also found that Brown's self-reported daily living activities undermined Dr. Shannon's opinions. Although there is not an absolute prohibition against this comparison, *see Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008), we have repeatedly cautioned against equating daily living activities with the ability to perform a full day of work, as the former

are often subject to different restraints (e.g., longer periods within which to complete and more frequent opportunities to rest) and at times can be avoided only at great personal cost. For example, we recently observed that

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (in this case, [the claimant]'s husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer.

*Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see also, e.g.*, *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("[Claimant] *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts.").

In failing to heed these warnings, the ALJ misrepresented many of Brown's daily activities. Although Brown cared for her young daughter throughout the day, she often sat or laid down while doing so and at times received childcare assistance from her mother and a friend. Brown also testified that she made meals for her family, but many meals were easily assembled—for example, microwavable frozen dinners and Hamburger Helper. Brown walked to a nearby park with her daughter on a near-daily basis, but the park was a mere two blocks away and had benches (or something else she could sit on). And although Brown may have performed "light" housework, she received significant help from her nephews—for example, transporting the laundry basket to and from the laundry area and removing clean dishes from the

dishwasher and putting them away. *See Craft*, 539 F.3d at 680 (holding that ALJ improperly considered claimant's daily living activities where claimant's "so-called 'daily walk' was merely to the mailbox at the end of the driveway, his vacuuming took only four minutes, and his grocery shopping was done on a motorized cart at the store and he was able to carry only one grocery bag in each hand into the house"); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (claimant's daily living activities "are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain").

So the ALJ must conduct a reevaluation of Dr. Shannon's opinions to determine whether they are entitled to controlling weight.

### C. No Reversible Error in Relying on Vocational Expert's Testimony

The ALJ determined that Brown could perform substantial gainful activity based primarily on testimony from a vocational expert regarding six particular jobs. Brown attacks the ALJ's reliance on this testimony on several grounds. For example, Brown claims that the ALJ erred in accepting the vocational expert's testimony that all six jobs could be performed sitting or standing and that the worker could be off task up to 10% of the time while doing so. However, Brown concedes that this testimony merely supplemented (and did not conflict with) the Dictionary of Occupational Titles (DOT), which means that she forfeited these arguments by failing to object to the testimony during the administrative hearing. *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) (claimant forfeited argument regarding reliability of data

underlying vocational experts' job-numbers opinions by failing to object during hearing); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (same). Brown also forfeited her argument regarding the vocational expert's testimony about the number of positions for each of the six jobs by failing to object during the hearing. *Id.*[1] And to the extent Brown alleges error in the ALJ's acceptance of the vocational expert's testimony relating to the telephone solicitor/call center position, Brown waived the issue by failing to raise it in her opening appellate brief. *Bonnstetter v. City of Chi.*, 811 F.3d 969, 973 (7th Cir. 2016).

That leaves us with Brown's argument concerning the vocational expert's testimony on greeters/attendants. We have repeatedly noted that if a vocational expert's testimony appears to *conflict* with the DOT, the ALJ "must obtain 'a reasonable explanation for the apparent conflict,'" and that a claimant's failure to object during a hearing cannot excuse an ALJ's failure to do so. *Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir. 2008) (per curiam) (quoting SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). An ALJ can accept conflicting testimony if the vocational expert's "experience and knowledge in a given situation exceeds that of the DOT's authors, or when the [vocational expert]'s contrary testimony is based on information in other reliable publications." *Id.* at 464 (citation and internal quotation marks omitted).

---

[1] Due to this forfeiture, we need not reach the applicability of *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015) (criticizing but not holding to be improper the ALJ's acceptance of the vocational expert's job-numbers testimony based on the unknown underlying data source). Of course, if another administrative hearing occurs, Brown may be able to test the vocational expert's reliance on her sources at that time.

At the administrative hearing here, the vocational expert opined that a person with Brown's residual functional capacity could perform work as a greeter/attendant. In doing so, she acknowledged that the DOT instructs that greeters/attendants perform "light" work, but opined that the "sedentary" label was more appropriate. The vocational expert defended this deviation by noting that greeters in theaters and in building lobbies typically have the option of sitting or standing, and that she had "place[d] a lot of people in those jobs, who use chairs, and are seated." The ALJ believed this was enough, but Brown claims that the vocational expert's departure from the DOT needed more support.

Although the issue is close, we agree with Brown. While the vocational expert's opinion does not appear conclusory—after all, she referenced her personal experience with placing individuals in sedentary greeter positions—the record does not indicate that her knowledge on the topic exceeds that of the DOT authors, or that her opinion is informed by another reliable publication. And because the ALJ declined to pose any follow-up questions on the subject, we are left without any additional information about the approximate percentage of the greeter positions that can be performed in a sedentary manner. Perhaps it is 95%; or perhaps it is closer to 9%, which would be an insufficient ground for trumping the DOT. In addition, the DOT listing that the vocational expert cited at the hearing (DOT 342.667-014, Attendant–Arcade) is unhelpful, since it lists job responsibilities that likely are not sedentary—in particular, "Perform[ing] minor repairs on game machines"; "Remov[ing] coin accepter mechanism of machines, using key, and observ[ing] mechanism to detect causes of malfunctions, such as bent coins, slugs, or foreign material"; and "Re-

mov[ing] obstructions, reposition[ing] mechanism, insert[ing] coins, and observ[ing] machine operation to determine whether malfunctions are still present."

Nevertheless, this error is harmless, since the other five non-greeter positions totaled 5303 jobs in Wisconsin alone. *Cf. Liskowitz*, 559 F.3d at 743 ("[I]t appears to be well-established that 1000 jobs is a significant number."). So Brown has failed to demonstrate that the ALJ committed reversible error in relying on the vocational expert's testimony.

### III.  CONCLUSION

The judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion. We encourage the Commissioner to assign a new ALJ to oversee any additional proceedings. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 357 (7th Cir. 2005).