NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued May 19, 2021
Decided August 27, 2021

**Before**

DIANE P. WOOD, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 20-2715

| | |
|---|---|
| HOLLY M. WRIGHT,<br>    *Plaintiff-Appellant,* | Appeal from the United States District<br>Court for the Southern District of Illinois. |
| *v.* | No. 3:19-CV-00762 |
| KILOLA KIJAKAZI, Acting<br>Commissioner of Social Security,<br>    *Defendant-Appellee.* | Gilbert C. Sison,<br>*Magistrate Judge.* |

## O R D E R

Holly Wright applied for disability benefits pursuant to the Social Security Act, 42 U.S.C. §§ 416(i) & 423, based on pain and fatigue in her back and migraine headaches. Following a hearing, an administrative law judge denied her claim, finding that although she had certain severe impairments, she was still capable of performing light work with certain physical limitations. On appeal, Wright argues that the ALJ ignored certain evidence that undermined this finding, erred in his evaluation of certain medical opinion evidence, and erred in his evaluation of Wright's subjective symptoms. The ALJ's decision, however, is supported by substantial evidence and contains statements explaining a reasonable rationale for his evaluation of the challenged findings. Therefore, we affirm.

I

Wright applied for disability insurance benefits in April 2015, alleging a disability onset date of April 15, 2015. The Social Security Commissioner denied her application initially and again upon her request for reconsideration. Wright then requested a hearing. An ALJ held a hearing on February 5, 2018. The ALJ denied the application on June 25, 2018, and the Appeals Council denied Wright's request for review, rendering the ALJ's decision final and subject to judicial review. Wright filed a complaint in the district court, and the district court judge affirmed the denial of benefits. This appeal followed.

A

Wright's medical history is voluminous. Wright was involved in two car accidents, one in 2004 and one in 2005, which led to chronic pain since that time. We, as did the parties, begin with her more recent medical history.

In March 2014, Wright underwent an MRI, reflected in a report from her primary care physician Dr. Hope Knauer. The MRI showed a small central disc protrusion abutting the L5 nerve roots bilaterally. Dr. Knauer could not determine whether the protrusion was clinically significant. Additionally, the MRI did not show any changes from an MRI taken in 2013. In June, September, and December of 2014, Wright received various treatments for her back pain, including radiofrequency denervation (a minimally invasive procedure) and trigger point injections in certain areas of her back, neck, paraspinal lumbar muscles, and gluteal muscles.

In early 2015, Wright was prescribed hydromorphone and diazepam. A report from Dr. Knauer dated February 6, 2015, reflects that Wright complained that she could not sleep at night due to her back pain, which occasionally radiated down her legs. Dr. Knauer noted that this was not a change in her symptoms. On February 10, 2015, Wright received another MRI of her lumbar spine. The MRI revealed no change from 2014. But Dr. Knauer noted a "small midline disc herniation causing indentation of the thecal sac and moderate central canal stenosis, the presence of mild impingement due to the presence of lateral recess stenosis and disc bulge that abuts the traversing LS nerve roots, plus mild bilateral foraminal stenosis." Wright received additional trigger point injections on two occasions before April 15, 2015.

On May 21, 2015, Wright consulted spinal surgeon Dr. Kevin Teal. She told Dr. Teal that she was experiencing back pain and numbness in both legs that made her fall on occasion. Dr. Teal reviewed Wright's February 2015 MRI and determined that she suffered from degenerative disc disease at L4-L5 and bilateral foraminal stenosis at L3-

L4 and L4-L5. Dr. Teal suggested fusion or decompression as treatment; Wright chose the latter. Dr. Teal performed lumbar spine surgery on May 26, 2015. In a follow-up visit, Wright told Dr. Teal that she continued to experience pain—at a level of 5 to 7 out of 10—in her back and left leg that she addressed with medication and physical therapy. Dr. Teal's exam revealed some loss of sensitivity in Wright's left foot but that her health was otherwise normal.

On June 23, 2015, a physical therapist examined Wright. Wright told the therapist that her pain levels were unchanged. The therapist noted that Wright's iliac crest was elevated, scoliosis was visible, and the lumbar and sacroiliac areas were tender. The therapist also took note of Wright's left leg strength.

In August, Wright told Dr. Teal that her back and leg pain persisted. Specifically, Wright complained of a back pain flare up brought on whenever she walked for 10 minutes. Dr. Teal determined that, based on his examination and Wright's complaints, the surgery he performed was not beneficial. He also advised Wright that she should receive an evaluation for fibromyalgia.

On September 9, 2015, another MRI was performed. It showed both scar tissue at L3-L4 and L4-L5 and stenosis at L4-L5 that had worsened. It also showed more scar tissue close to certain nerve roots.

In October 2015, Wright saw a nurse practitioner in Dr. Knauer's office. Wright told the nurse that she wanted a second opinion. She also said that her back pain was increasing and that she now experienced numbness in both legs. Dr. Knauer continued her pain medication prescriptions. Also in October 2015, Wright saw a pain specialist, Dr. Ghalambor,[1] who reviewed one of Wright's MRI reports and performed a physical exam. That exam showed some tenderness in Wright's back. Dr. Ghalambor later administered epidural steroid injections (ESI) in Wright's back on two separate occasions.

In November, Wright saw a rheumatologist, Dr. Ruth Craddock, to evaluate her fibromyalgia. Dr. Craddock examined her back and noted Wright's limited range of motion and accompanying pain. Dr. Craddock also noted that Wright was "resistant" during the exam and had an "exaggerated 4+ pain response" to the fibromyalgia tests in spite of Wright's use of Dilaudid, a powerful opiate.

In November and December 2015, Wright saw a second orthopedic surgeon, Dr. Ra'kerry Rahman. Wright told Dr. Rahman that the back surgery Dr. Teal performed

---

[1] Dr. Ghalambor's first name is not in the record.

helped ease her pain in the right leg but not in her back or left leg. She also told Dr. Rahman that she still experienced some numbness in her left leg, particularly when walking or crossing both legs. Wright complained that the four epidurals she received one week prior were ineffective. Dr. Rahman noted, "[I]f her leg symptoms were alleviated, she would be fine with the chronic back pain." Dr. Rahman also reviewed Wright's September 2015 MRI and noted a disc bulge at L4-L5 leading to stenosis.

On December 11, 2015, state agency examining consultant Dr. Vittal Chapa examined Wright. Wright told Dr. Chapa that her lower back pain was intense, that she felt this pain in her legs, and that the numbness she experienced in her legs was not improved by her back surgery. She said she needed to frequently sit and lie down to relieve these symptoms. She also said that she needed another back surgery. Additionally, she told Dr. Chapa that she suffered from fibromyalgia, that she experienced pain throughout her body, and that she suffered from migraines about twice a year. Dr. Chapa's exam revealed some weakness in Wright's left ankle, left leg strength of 4/5, some dullness in her left leg when pinpricked, lumbar spine flexion of 30 degrees, and negative straight leg raise when sitting and positive when supine. But Dr. Chapa did not discover any trigger points of fibromyalgia. Dr. Chapa also noted that Wright had no problem stepping up or down from the exam table, some difficulty walking in general (and walking on her heels, but even more difficulty walking on her toes), and that she could not squat down and then stand up.

On March 10, 2016, Wright told Dr. Knauer that she couldn't exercise due to pain. In June of that year, Dr. Shane Fancher, a pain management specialist, determined Wright suffered from failed back syndrome and had scar tissue at L3-L4 and L4-L5. Dr. Fancher advised Wright to undergo an ESI at those points on her back. Additionally, Dr. Fancher noted that if the ESI proved unsuccessful, the pain management clinic could no longer offer treatment to her going forward.

In September 2016, Wright received another MRI. It showed "stable postoperative changes, multilevel degenerative changes, and a disc herniation at L4-L5 causing a thecal sac mass effect." In November 2016, Dr. Knauer, following a medication check-in, ended her treating relationship with Wright. Dr. Knauer noted that she was uncomfortable continuing her treatment of Wright because of certain inconsistencies in the health history Wright provided. Wright then replaced Dr. Knauer as her primary care physician with Dr. Muhammad Islam. In April 2017, Dr. Islam switched Wright's prescription pain medications from hydromorphone to morphine. He also referred Wright for another MRI. That MRI's findings were similar to those in Wright's September 2016 MRI.

Wright received various other pain treatments throughout early and mid-2017. In August 2017 she again consulted Dr. Rahman, who recommended another surgery. On September 6, 2017, Dr. Rahman performed a decompressive laminectomy and transforaminal interbody fusion at L4-L5. Shortly thereafter Wright told Dr. Rahman that her pain had decreased despite a constant pain in her lower back that radiated to the area in between her shoulder blades. For this pain Wright self-medicated with medical marijuana and Tylenol. In November, Wright went back to Dr. Rahman and complained both about lower back pain when seated or standing and about numbness in her left leg. Dr. Rahman noted Wright seemed well and was pleased with the surgical outcome.

B

In February 2018, the ALJ held an evidentiary hearing on Wright's disability application. Wright testified at the hearing. She told the ALJ she lived with her fiancé and daughter, a seven-year-old suffering from cystic fibrosis. She also noted that the last job she had was working as a cashier, and that she left that job shortly before her first back surgery. Turning to her physical condition, Wright testified that she could not work or perform normal activities because of the pain and fatigue in her lower back, which caused her to spend a lot of the time of each day reclining and laying down. Wright noted difficulty standing for more than 15 minutes. She also testified that she struggled with cooking or making food other than frozen food, going to the grocery store, and driving for more than ten minutes. Additionally, Wright explained that she took frequent breaks when washing the dishes, the only chore that she performed. Wright noted that when her daughter needed to get to the school bus, Wright would drive her to the bus stop, which was at the end of Wright's driveway. Finally, Wright explained that her back problems had not improved after either surgery.

The ALJ also received opinion evidence. On July 23, 2015, Dr. James Madison, a state agency medical consultant, opined that Wright could perform light work, "occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, frequently balance, kneel, and crawl, and occasionally stoop or crouch." Dr. Madison based his conclusions on a review of Wright's treatment records. Dr. Lenore Gonzalez, another state agency medical consultant, reviewed Wright's medical records, including documents from Dr. Teal's post-surgery appointments with Wright, and arrived at the same conclusion as Dr. Madison. In August 2015, Dr. Teal noted that Wright could perform medium or light work that did not require lifting more than 30 pounds, twisting, or jarring. Dr. Knauer, in a form dated September 22, 2015, stated Wright needed both one hour of breaks during an eight-hour workday and two days off per

month. Dr. Islam provided an opinion on December 3, 2017, that Wright required the same one-hour break per eight-hour workday and three days off per month and found credible Wright's "subjective complaints" that she must lie down for half of each day and could not walk or stand more than one hour due to pain.

C

After the hearing, the ALJ issued his decision, concluding that Wright was not disabled. The ALJ applied the standard five-step analysis. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). On the first step, the ALJ found that Wright had not engaged in substantial gainful activity since April 15, 2015, the alleged onset date. At step two, the ALJ found that Wright had four severe impairments: "lumbar degenerative disc disease with stenosis and radiculopathy, status post L3-4 and L4-5 laminotomy and foraminotomy and TLIF L4-5; post-laminectomy syndrome; fibromyalgia; and Hashimoto's thyroiditis." At step three, the ALJ found Wright did not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. 404 Subpart P, Appendix 1. Jumping to step five, the ALJ found that, based on Wright's age, education (a high school degree and some college courses), and work experience, she could perform other jobs that exist in significant numbers in the national economy.

The ALJ's analysis at step four is the focus of this appeal. On this step, generally, the ALJ assessed Wright's residual functional capacity and past relevant work. The ALJ found that Wright could perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with restrictions. With respect to those restrictions, the ALJ found that Wright could never climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs, occasionally stoop and crouch, and could frequently balance, kneel, and crawl. The ALJ also concluded that Wright could not perform any of her past relevant work.

Summarizing its RFC analysis, the ALJ noted that it carefully considered all the evidence and found Wright's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Wright's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" The ALJ then described the evidence and his reasons for his conclusions. The ALJ recounted Wright's medical history. The ALJ began by noting the two car accidents in which Wright was involved before discussing, in detail, her numerous interactions with healthcare professionals from February 2015 to November 2017, including: Wright's February 2015 MRI; Wright's May 2015 appointment with Dr. Teal; Wright's May 2015 back surgery;

Wright's follow-up appointments with Dr. Teal in June and August of 2015; Wright's September 2015 MRI; Wright's appointment with Dr. Craddock in November 2015; Wright's December 2015 exam with Dr. Chapa; Wright's ultrasound with Dr. Dean Collette in March 2016; Wright's April 2017 physical exam; the MRIs in May and August of 2017; Wright's September 2017 back procedure; Wright's CT scan in November 2017; and Wright's appointment with Dr. Rahman in November 2017. In his discussion of each interaction, the ALJ also recounted several of the statements Wright's doctors made, as discussed above, concerning either pain or weakness Wright experienced in her back and legs, as well as statements Wright made to her doctors.

The ALJ then concluded: "Considering the totality of [Wright's] reported symptoms of lower back pain and numbness in her leg, as well as her treatment history and diagnoses, [Wright] is understandably limited in her ability to lift, stand, sit, walk, and perform certain postural actions." But the ALJ found that Wright's "statements about the intensity, persistence, and limiting effects of her symptoms[] are inconsistent with the record." In support, the ALJ noted that Wright never told her medical providers that she had to spend most of each day laying down (as she stated at the evidentiary hearing). The ALJ also observed that Wright's testimony about her current treatment for pain—a muscle relaxer and medical marijuana—was "conservative" when compared to the rather severe pain she described. Finally, the ALJ pointed to the various daily activities Wright admitted that she can perform.

The ALJ then turned to the other evidence in the record that supported his conclusion concerning Wright's RFC. He noted certain evidence that indicated Wright was resistant to certain treatments and recounted Dr. Knauer's statement about the "inconsistencies in regard to [Wright's] health history" that led Dr. Knauer to suggest Wright seek another healthcare professional's services. The ALJ then pointed out the inconsistency of Wright's statements concerning her back surgery—at one point, she said the surgery "made no difference," but at another, she reported her happiness with the surgery and told the health care professional she was "doing very well." Moving to the opinion evidence, the ALJ discounted Dr. Islam's opinion because the evidence did not show whether he examined Wright after her September 2017 procedure and his opinion was inconsistent with Wright's treatment record, "[Dr. Islam's] own examinations and the CT scan he ordered and reviewed," and Dr. Teal's opinion. As for Dr. Teal, the ALJ credited his opinion that Wright could perform light to medium work both because Dr. Teal gave it shortly after Wright's May 2015 surgery and because Wright's "symptoms remained somewhat consistent after" Dr. Teal rendered his opinion "and if anything[]" those symptoms "ha[d] improved since [Wright's] spinal fusion surgery in September 2017." The ALJ also credited Dr. Gonzalez's and Dr.

Madison's opinions that Wright could perform light work because those opinions were "consistent with Dr. Teal's [opinion] and the totality of the objective evidence." The ALJ also noted that both were familiar with the disability process and requirements. In sum, the ALJ found that Wright could perform light work subject to the limitations mentioned above. Wright now brings three challenges on appeal, each discussed below.

II

We review de novo the district court's judgment affirming the agency's final decision, "meaning we review the ALJ's ruling directly." *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). We review the ALJ's factual determinations deferentially and affirm if substantial evidence supports the decision. See 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (quotation omitted). "[W]hatever the meaning of 'substantial' in other contexts," the Supreme Court has emphasized, "the threshold for such evidentiary sufficiency is not high." *Id.*

A

First, Wright argues that the ALJ ignored certain evidence that undermined his RFC determination. In support, Wright points to parts of her medical records that the ALJ did not explicitly reference. As the district court put it, "[Wright] here seems to have pulled from the record almost every bit of medical evidence that was not mentioned by the ALJ[.]" Wright effectively faults the ALJ for not comprehensively listing the entire course of her treatment, but we reject this interpretation of the ALJ's duties and, more to the point, Wright's interpretation of the ALJ's decision.

While an ALJ is prohibited "from ignoring an entire line of evidence that supports a finding of disability," the ALJ is not required to "discuss every piece of evidence in the record." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation omitted). Nor is the ALJ required to provide a "complete written evaluation of every piece of testimony and evidence[.]" *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (quotation omitted). And we will not "nitpick[]" the ALJ's decision, but rather give the opinion a "commonsensical reading," focusing on whether the ALJ built a "logical bridge from the evidence to his conclusion." *Id.* at 369 (quotations omitted). The ALJ here adequately supported his decision.

Wright's arguments to the contrary do not persuade. Wright asserts that the ALJ's most egregious omission was that he did not fully discuss the findings of a September 2015 MRI. But the ALJ did address this MRI, and we do not fault the ALJ for

failing to quote every word in the MRI report. For the same reasons, Wright's other challenges fall flat. For example, Wright argues that the ALJ "completely failed to even acknowledge" that Wright's physical therapist documented Wright's deficits involving a limited range of motion in her lumbar spine and less than normal strength in her lower extremities. But the ALJ acknowledged that Wright had been receiving physical therapy and repeatedly discussed her reported back pain and the weakness in her back and legs. This is not "ignoring an entire line of evidence." *Deborah M.*, 994 F.3d at 788. Similarly, we reject Wright's contention that the ALJ erred in his discussion of Wright's pain management treatment. The ALJ quoted from one doctor's report that Wright may "need to be weaned off narcotics" because she was "writhing under minimal touch on exam, tearful in describing her pain, despite more Dilaudid than most large men would take." It is thus clear from the ALJ's decision that he considered Wright's pain management treatment.

In short, the ALJ's detailed discussion of Wright's medical history conformed to the applicable legal standards, and Wright's arguments do not convince us otherwise.

B

Next, Wright raises various arguments related to the ALJ's weighing of the medical opinion evidence from her primary care physicians, the spinal surgeons, and two state agency physicians. Wright argues that the ALJ improperly discounted the opinions of her primary care physicians, Dr. Knauer and Dr. Islam (Wright's replacement for Dr. Knauer), each of whom made statements suggesting that Wright was not suitable for light work. Wright also faults the ALJ for overweighing the opinions of the two state agency physicians and for not discussing certain other statements by various other medical providers, including her physical therapist. Throughout this argument, Wright faults the ALJ for failing to comply with the checklist set forth in 20 C.F.R. § 404.1527(c), which outlines the factors an ALJ should consider when weighing such medical opinion evidence in disability applications filed before March 27, 2017.

"[W]hile the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (quotation omitted). A treating physician's medical opinion "is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). If the ALJ decides not to give the opinion controlling weight, he is to weigh it by applying the factors set forth in § 404.1527(c). These factors include, among others, the examining relationship, the treating relationship, the length of the treating relationship and

frequency of examination, the supportability of the opinion based on the quality of the explanation given, the consistency of the opinion with the record as a whole, the specialization of the source of the opinion, and other factors raised by the applicant.

The ALJ did not explicitly list the § 404.1527(c) factors, but "we will not vacate or reverse an ALJ's decision based solely on a failure to expressly list every checklist factor" so long as the ALJ analyzes the treating physician's medical opinion within the multifactor framework. *Ray v. Saul*, —F. App'x—, 2021 WL 2710377, at *3 (7th Cir. 2021) (citing *Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021)). In this case, the ALJ met his minimal burden to articulate his reasoning for crediting and discounting certain medical opinions. And the ALJ did so within the proper multifactor analytical framework. For example, the ALJ gave additional weight to the specialist physicians— the spinal surgeons—and reduced weight to the primary care physicians, one who had only treated Wright for a short time and another who had stated an opinion (that Wright could only do sedentary work) which was inconsistent with the records from the physician's office (which included several examination reports that indicated no significant findings). This mode of analysis is consistent with § 404.1527(c)(5), which instructs an ALJ to "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty." Moreover, the ALJ's determinations were supported by other facts in the record, including that Wright had seen each surgeon on multiple occasions, including for an initial consultation and for follow up appointments after the surgeries.

We need not repeat the district court's thorough discussion of each challenged opinion and the basis for the ALJ's findings. We conclude the ALJ articulated the bases for the weight he afforded each opinion that Wright challenges.

C

Finally, Wright briefly argues that the ALJ erred by discounting her statements about the intensity and persistence of her pain. We reject this argument, too. "We give the ALJ's credibility finding special deference and will overturn it only if it is patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (quotations omitted). As in the district court, Wright argues now that the ALJ's credibility determination was improper because it was predicated on his failure to consider the full record. But, in light of our discussion above, we disagree with Wright's premise. And, in any event, the ALJ explained what objective medical evidence he relied upon when rejecting Wright's subjective assessment of her pain. For example, the ALJ noted that many medical reports indicated that Wright appeared to move well at her appointments, which was inconsistent with her statements of pain. The ALJ also pointed out that at

times Wright had been resistant to certain treatments, including those treatments recommended by her rheumatologist. Such statements satisfy us that the ALJ's credibility determination did not lack explanation or support. See *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

To the extent Wright now argues that the ALJ did not sufficiently develop the record to justify his reliance on Wright's testimony about her day-to-day life, this argument was not raised in the district court and is thus waived. In sum, because the ALJ has explained his reasoning and the reasoning is supported by substantial evidence, we must reject Wright's arguments.

AFFIRMED